# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **CHRIS CARTY,**  Plaintiff | ) )  Civil Action No.: 7:13cv00234 |
| v. | ) ) ) **REPORT AND RECOMMENDATION** |
| **P. SCARBERRY, et al.,**  Defendants | ) )  By: Pamela Meade Sargent )  United States Magistrate Judge |

The pro se plaintiff, Chris Carty, is a Virginia Department of Corrections, ("VDOC"), inmate currently housed at Red Onion State Prison, ("ROSP"). An evidentiary hearing was held before the undersigned on the pro se plaintiff's motion for preliminary injunctive relief, (Docket Item No. 15) ("Motion"), on October 23, 2013. The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

## *I. Facts*

Carty brings this civil rights action against P. Scarberry, ROSP Food Service Director, and R. C. Mathena, ROSP Warden. Carty claims that these defendants have refused to provide him with the proper medically prescribed diet. By Memorandum Opinion & Order entered October 9, 2013, the court refused Carty's Motion insofar as it sought entry of a preliminary injunction ordering that the defendants provide him with a "vegetarian cardiac diet." The Motion also claims that Carty is being subjected to cruel and unusual punishment through inhumane

conditions of confinement and other actions taken by ROSP employees in retaliation for filing this action against the defendants. Carty appeared and testified at the October 23 evidentiary hearing on these additional claims. Carty's testimony, which is set forth below, was, in large part, vague, confusing and contradictory.

Carty testified that he has been held in segregation at ROSP for approximately four years. Carty stated that, on the date that he filed this action, he was being housed in ROSP segregation cell C-320. After he filed suit, which the court's docket shows occurred on May 20, 2013, Carty said that he was moved to cell C-406. While being housed in cell C-406 on June 29, 2013, Carty testified, he was injured when ROSP Correctional Officer White tripped him causing him to fall while in restraints. Carty stated that his lip was busted and a tooth chipped in this incident. After this incident, Carty stated that he was moved to cell C-306, where he testified that he has been housed for approximately four months.

Carty testified that, on June 29, 2013, he requested to take a shower. He stated that White, accompanied by Correctional Officers McCarty and Beverly, came to his cell door to escort him to the showers. Carty stated that he turned his back to the cell door and presented to be placed in restraints before exiting the cell. According to Carty, when the cell door was opened, White "charged" into his right side, pushing him into the cell and tripping him. Carty said that he fell face first, busting his lip and breaking his left front tooth. Later in his testimony, Carty stated that it was his right front tooth that was damaged in this incident and that it remained loose. Carty said that McCarty and Beverly did not assault him.

Because he could not get the proper forms, Carty testified, that he wrote out his own forms to complain of the incident. Carty stated that Plaintiff's Exhibit No. 1 was one of these handwritten forms he used to complain of White's June 29, 2013, assault. Plaintiff's Exhibit No. 1 is a handwritten document entitled "Informal Complaint," which is dated July 4, 2013, and addressed to the Inmate Grievance Department. Attached to this "Informal Complaint" is a ROSP medical record showing that Carty was treated for a broken tooth and small laceration on his lip as a result of being "placed on floor" on June 29, 2013. The medical report reflects that Carty was placed in ambulatory restraints after this incident and released from these restraints the next day.

Carty testified that a number of ROSP correctional officers have refused to deliver his food trays or have tampered with his food trays since he filed this action. In particular, Carty stated that Correctional Officers Woliver and Meade repeatedly refused to give him food trays when he was still housed in cell C-320. Carty stated that Woliver and Meade worked the same shift from 6 a.m. to 6 p.m. and that, every time Woliver and Meade worked, they did not give him a meal tray. Carty testified that he had been denied meal trays on "dozens" of days. He stated that, at the time he filed this suit in May 2013, he weighed between 125 and 120 pounds. Carty said that, on the date of the hearing, he weighed only 100 pounds.

Despite the fact that Carty had earlier testified that Woliver and Meade had refused to give him food trays while he was housed in cell C-320, more than four months ago, Carty later stated that he could not recall when Woliver and Meade had last denied him a food tray, but he believed it last occurred approximately one month prior to the hearing date. Carty further stated that other officers had refused

to give him food trays on other occasions, but he could not identify any of these officers or identify any other specific date on which he had been denied a food tray.

Carty also testified that correctional officers had confiscated all his property and had torn up all of his legal mail and documents. Carty did not identify the officers who he claims did this, and he said that he could not recall when this occurred. Carty also claimed that correctional officers refused to give him informal complaint forms. Again, he did not identify which officers refused to give him these forms or when he alleges this occurred.

Carty testified that on June 8, 2013, he was assaulted by Correctional Officer S. Taylor resulting in a broken finger. Despite his earlier testimony, Carty, here, testified that he was being housed in cell C-320 on June 8, 2013. Carty stated that Meade accused Carty of throwing a liquid substance on him. Carty said that Sgt. Kiser ordered him to present himself to be restrained. Carty said that he followed Sgt. Kiser's instructions and was restrained. He said he then was taken from his cell by Taylor and Correctional Officer Messer. Carty testified that, as he was being escorted through the pod, Taylor was applying force to his index and middle fingers of one of his hands. Carty testified that, when they reached the bottom of the stairs, he was thrown to the floor by the officers, breaking one of his fingers. Carty also stated that he received a cut on his hand.

Carty stated that Plaintiff's Exhibit No. 2 was one of the handwritten forms he used to complain of the June 8, 2013, assault. Plaintiff's Exhibit No. 2 is a handwritten document entitled "Informal Complaint," which is dated July 4, 2013,

and addressed to the Inmate Grievance Department. Attached to this "Informal Complaint" is an ROSP medical record showing that Carty complained of three broken fingers on his right hand on June 8, 2013. The medical report reflects that Carty was placed in ambulatory restraints after this incident and released from these restraints the next day. This medical report also reflects that Carty refused to be let up from restraints on June 8 to allow the nursing staff to assess him. A further medical report dated June 9, 2013, documents a small cut in his right hand and slight swelling of his right wrist.

Carty testified that on June 15, 2013, Correctional Officer C. Rose spit and put dirt in his food tray. Carty testified that this continued up to the date of the hearing, although he admitted that Rose was no longer working in his pod. He said that other officers had continued to do so.

Carty testified that everyone at ROSP knew about his complaint about receiving the wrong diet and about him filing this suit. Carty testified that "everyone" would tell him: "Lawsuit ain't going to help you" and "nobody care about you." Carty testified that he had been refused access to showers and recreation since the filing of this lawsuit. At one point in his testimony, Carty specifically testified that he had been denied a shower or recreation for the past four to five months.

Carty admitted as Plaintiff's Exhibit No. 3 a letter he received from the American Civil Liberties Union of Virginia, ("ACLU"), and a letter he wrote to the ACLU in response. In Carty's letter in response, he stated that Lt. S. Franklin and Sgt. E. Miller denied him showers and outside recreation every day that they

worked. Carty complained that he was being held in a cold cell with no blanket and no socks. He also claimed that Correctional Officers M. Addington, S. Taylor, A. Vaughan and Woliver had destroyed or thrown away all his legal and personal mail and personal hygiene items on June 8, 2013. Carty also claimed that he was being denied food trays and that his food trays were being spit on or dirt or other substances added to the food by M. Woods, C. Rose, Meade, Woliver, M. Addington and S. Taylor. Carty claimed that these actions were being taken against him because of his "heritage and cultural background" and because of his filing litigation with the courts, including this suit against the defendants over his diet. Oddly, Carty also claims that his status as a segregation prisoner prevents him from participating in religious fasting as part of his Rastafarian faith.

Carty admitted as Plaintiff's Exhibit No. 4 a handwritten "Emergency Notice" addressed to W. Swiney, Unit Manager C Building, and dated August 7, 2013. In this "Emergency Notice," Carty stated that White was harassing and provoking him and threatening to kill or assault Carty if Carty left his cell to take a shower or for recreation. In this "Emergency Notice" Carty also claims that Wood had put a substance that smelled like detergent in the beans on his lunch food tray on August 6, 2013. He also complained that his dinner food tray on August 6, 2013, smelled like pepper spray.

In a letter from Carty dated August 6, 2013, and received by the court on August 16, 2013, (Docket Item No. 22), Carty stated that he was in fear for his life because Correctional Officers C. Rose, M. Woods, S. White, S. Taylor and M. Addington were constantly putting "stuff," i.e. detergent, pepper spray and salt, in his food. In this letter, Carty stated that he wrote to Warden Mathena requesting

help and received no response. A copy of the "Emergency Notice" Carty claims he provided to Warden Mathena is attached to this letter. (Docket Item No. 22-1). In this "Emergency Notice," Carty claimed that White and Woods denied him his lunch and dinner meal trays on August 5, 2013. Carty also stated that these officers were harassing him by constantly coming to his cell and insisting that he go to the shower. Carty also claimed that he was being denied complaint forms and access to the telephone system in the August 8 letter.

Also attached to the August 8 letter was a July 3, 2013, "Notice" from Carty addressed to Warden Mathena. This Notice complains of the June 29, 2013, alleged assault by White. This Notice also states that White was harassing Carty by constantly asking Carty to go to the showers or out for recreation. Carty also claims in this Notice that Woods was constantly applying pepper spray and salt to his food trays.

Carty testified that he placed these notices to Warden Mathena in the prison mail system and that he was able to keep copies of them that he created using carbon paper.

ROSP Warden Randall Charles Mathena also testified at the October 23, 2013, hearing. Mathena stated that he had been the Warden at ROSP for two years. Mathena testified that he made rounds throughout the prison at least once a week and that he was familiar with Carty from going by Carty's cell during these rounds. Mathena testified that he became aware of this lawsuit only a couple of weeks before the hearing and that he had not spoken to anyone at the prison, not even co-defendant Scarberry, regarding Carty's claims.

Mathena testified that ROSP had approximately 850 inmates with about 150 inmates housed in segregation cells. Mathena stated that to be designated an "S-status" or segregation status inmate, the inmate had a violent past either before coming to prison or after being incarcerated. Mathena testified that an inmate in segregation received the usual prison clothing and received only basic toiletry items. Mathena said that he knows of no reason why an inmate in segregation would not have socks. He testified that ROSP has centrally controlled heating and air conditioning that is set on 70 degrees year round.

Mathena testified that he does not recall ever receiving a letter or other notice from Carty. Mathena also testified that the VDOC has a zero tolerance policy regarding any acts of retaliation against an inmate.

Patricia Ann Scarberry, Food Service Director at ROSP, also testified at the hearing. Scarberry stated that she learned of Carty's lawsuit against her about a month before the hearing. Scarberry stated that she had not spoken to anyone at the prison about the lawsuit. Scarberry also testified that the VDOC has a zero tolerance policy regarding any acts of retaliation against an inmate.

Scarberry testified that a "cardiac diet" is a medically ordered low sodium, low fat diet, but not a vegetarian diet. She stated that inmates could request a "meat alternative diet," but that a medically ordered diet always took priority over an inmate's requested diet.

Scarberry stated that, over the one and a half years she has worked at ROSP, she has received several request for services forms, informal complaint forms and

grievances from Carty. Scarberry stated that she had never received one of these documents completely in Carty's own handwriting.

Lt. Paul Payne, the ROSP C Building Lieutenant, also testified at the October 23 hearing. Payne testified that Correctional Officer Rose was under his supervision on June 15, 2013. Payne stated that he received an informal complaint from Carty regarding his allegations that Rose spit on and put dirt in Carty's food tray on June 15, 2013. Payne said that he spoke to Rose about Carty's allegation and that Rose denied the allegations. Payne stated that Rose was a very professional correctional officer. Payne also stated that he was not aware of this lawsuit until he was asked to testify at the hearing.

Payne testified that a correctional sergeant makes rounds in the segregation pods of ROSP every morning and asks each inmate if he would like to shower and go to recreation. Payne stated that Carty has been given an opportunity every morning to shower and go to recreation. Payne stated that Carty has never spoken to him regarding any denial of his shower or recreation. Payne also stated that Carty has never requested an informal complaint or grievance form from him. Payne also stated that Carty was not then under any restriction regarding complaint or grievance forms. Payne stated that he was familiar with S. White, but he was not familiar with S. Taylor. He stated that Meade, Woliver and E. Miller were not on his break and that S. Franklin was not on his shift.

Payne stated that he was in the C Building of ROSP on a daily basis. Payne testified that Carty had never made an oral complaint to him about officers tampering with his food trays or about officers refusing to give him a food tray.

Payne stated that ROSP inmates received three meals a day, unless they were on "nutrition loaf," in which case they received only two meals of nutrition loaf a day. Payne stated that he was not aware of Carty ever being placed on the nutrition loaf. Payne stated that he was not aware of Carty refusing his food trays. He stated that sometimes Carty would eat everything on his tray and sometimes he would return it having eaten nothing.

Payne stated that, if an inmate is placed on strip cell status, he would be denied a blanket. Payne also stated that, if an inmate was placed in restraints, his clothing would be removed, and a safety smock would be placed on the inmate. Payne stated that Carty had been placed in restraints during the previous few months. Payne stated that he could not recall Carty being placed on strip cell status. Payne also stated that the correctional officers could not control the temperature in the C Building and that it usually ranged from 70 to 74 degrees.

Correctional Officer C. Rose also testified. Rose stated that he had worked at ROSP for approximately one year. Rose stated that Lt. Payne spoke with him on June 15, 2013, regarding Carty's complaint that Rose had tampered with his food tray. Rose testified that he did know that Carty had issues with his medical diet. Rose stated that he routinely would retrieve the food cart containing the food trays from Food Services.

Rose stated that he did not know that defendants Mathena and Scarberry had been sued by Carty until the Friday before the hearing. Rose stated that he knew S. White, but did not know S. Taylor. Rose testified that he has never seen S. White

with Carty. Rose stated that he worked in the housing unit holding Carty, but he stated that he did not routinely feed meals to Carty's tier. Rose stated that the last time he distributed a food tray to Carty, Carty accepted it.

Correctional Officer Justin Eugene Woliver testified at the hearing. Woliver stated that he used to work the side of the C Building in which Carty was housed and that he did work with Carty in June 2013. Woliver stated that he was involved in an incident with Carty on June 12, 2013. Woliver stated that he was working with Correctional Officer Meade. He stated that when he went to pick up Carty's breakfast food tray on that date, Carty had the tray slot door propped open, and the tray slot door could not be fully closed and secured. Woliver stated that Carty was denied a lunch tray on that day because he would not remove the object obstructing the closing of the tray slot door. Woliver stated that he denied Carty a meal tray only on that one day.

Woliver stated that he only learned of this lawsuit three to four days before appearing in court. Woliver stated that he did not recall Carty ever asking him for an informal complaint or grievance form.

Correctional Officer Andrew Ryan Meade testified that he had worked at ROSP for more than a year. Meade stated that he recalled an incident in which, after distributing the breakfast trays, officers found that Carty had used an inmate pen to prop open the tray slot door. Meade stated that Carty refused to remove the pen and started cursing staff. Just the day before, according to Meade, Carty had thrown urine on him. Meade stated that he reported that Carty had the tray slot door jammed so it could not be closed. Because Carty would not remove the pen,

Meade said that he did not receive another tray that day. Meade testified that he could not remember any other day on which he refused to feed Carty. He also stated that Carty was on nutrition loaf on the day of this incident because of throwing urine on him.

Meade stated that he has refused to take Carty to the showers or recreation only if Carty has not followed the proper security procedures to exit the cell. Meade testified that Carty has refused showers and recreation. Meade also testified that he is not aware of any other officer refusing food, showers or recreation to Carty.

ROSP Sgt. Justin Kiser also testified that he had worked in the housing units housing Carty. Kiser stated that his last contact with Carty was a couple of weeks before the hearing. Kiser stated that in June 2013, Carty filed an informal complaint claiming that Woliver and Meade had refused to give him his breakfast and lunch food trays. Kiser stated that the officers had told him that Carty had wedged a piece of plastic into the tray slot to prevent the tray slot door from closing completely. The officers told him that Carty refused to remove the obstruction and that they refused to feed him one meal. Kiser stated that when he attempted to talk about the situation with Carty, Carty would not speak to him. Kiser stated that he was not aware of any other officers refusing food to Carty on any other occasion. Kiser stated that he was aware that Carty would not eat much, if anything, on his tray on many occasions. Kiser also testified that Carty would go long stretches of time where he would refuse to take a shower. Kiser stated that many mornings when he asks Carty if he wants to take a shower or go to recreation, Carty makes no response at all. This, Kiser said, is marked as the

inmate refusing. Kiser testified that he was not aware of this lawsuit until the Thursday before the hearing. He also testified that Carty had never complained to him about officers denying him food, showers, recreation, clothing or a blanket. He also said that he had never refused to provide Carty with an informal complaint or grievance form.

Subsequent to the October 23, 2013, hearing, the defendant provided the court with affidavits from Correctional Officers S. White and S. Taylor. (Docket Item No. 42, Att. Nos. 1, 2). S. White, in his affidavit, admits that he was involved in the use of force against Carty on June 29, 2013. White maintains, however, that the force used was necessary to control Carty's actions under the circumstances. White claims that, as Carty was being restrained by White and Officer McCurdy to be taken from his cell to the shower, Carty spit on him. When this occurred, White said, he and McCurdy placed Carty up against the wall, face first. White said that Carty remained combative and kept trying to spit on them, so, in order to have better control of Carty, they placed him face down on the floor. White said that after being placed on the floor, Carty bit his own lip to draw blood in an effort to spit the blood on them.

White stated that he did not intentionally slam Carty down to the floor or sweep him off of his feet. Instead, White said that he used force in an effort to control Carty's actions. White said that his actions did not break Carty's front tooth or bust his lip. White said that he charged Carty with a disciplinary code violation for spitting on him and that Carty was convicted of the violation.

White stated that he has never denied Carty the opportunity to take a shower or to participate in recreation. White also stated that he has never threatened, harassed or retaliated against Carty. White stated that he has never attempted to prevent an inmate from filing a lawsuit or having access to the courts. According to White, he did not know how many lawsuits Carty has filed or who he has sued, and he has not retaliated against him or harassed him because of any pending lawsuit.

According to S. Taylor, he was working the C pod on June 8, 2013, when Carty squirted a liquid that appeared to be feces and urine out through the side of his cell door, striking Officer Meade. As a result of this, Taylor said, Sgt. Kiser ordered Carty to present himself to be restrained so that he could be removed from his cell and placed in ambulatory restraints. Taylor said that Carty complied and he assisted Sgt. Kiser in placing Carty in restraints to be removed from his cell. Taylor said that a spit mask also was placed on Carty.

Taylor said that he and Officer Messer then escorted Carty to the C Building vestibule so that he could be placed in ambulatory restraints. Taylor said that Carty was agitated and disruptive while being escorted to the vestibule and that he tried to pull away from them. As a result, Taylor said that they used the "wristlock technique" on Carty. According to Taylor, "wristlocks" are a pain and compliance technique which is used to cause an offender to comply with what has been ordered. Taylor said that Carty continued to be combative while being placed in ambulatory restraints. Nonetheless, Taylor said, a nurse checked Carty after he was placed in ambulatory restraints, and he voiced no complaints of injury. Taylor said that he did not assault Carty, break his finger or injure him in any way on June

8, 2013. Taylor said that he also did not observe any other person injure or harm Carty.

Taylor said that Carty continued to be disruptive and was placed in five-point restraints later that day. According to Taylor, a nurse again checked Carty and he again voiced no complaints of injury. Taylor said that he has not denied Carty the opportunity to take showers or to participate in recreation. Taylor said that he has not threatened, harassed or retaliated against Carty. Taylor said that he does not know how many lawsuits Carty has filed or who he has sued. He said that he has not retaliated against Carty or harassed him because of any pending lawsuit.

Carty also has filed an affidavit subsequent to the October 23 hearing. In this affidavit, Carty denied throwing any substance on Meade on June 8, 2013. In this affidavit, Carty said that Taylor applied "needless use of force" upon his fingers while escorting him to the C Building vestibule. In the affidavit, Carty stated that, once they reached the bottom of the stairs, Taylor threw him to the floor, shouting "stop resisting, stop resisting." Carty said that his index finger and possibly middle finger were fractured, but he did not say on which hand. Carty said that while being placed in ambulatory restraints, Taylor used even more force on his hand, "tearing" and "splitting" the flesh between his index and middle fingers. According to Carty, the wound "started to pour blood all over the … floor creating such a big gash that it had required stitches." Carty said the medical department refused to apply stitches.

*II. Analysis*

"The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989)). The party seeking entry bears the burden to establish that these factors support granting a preliminary injunction: (1) the likelihood of irreparable harm to the movant if preliminary injunctive relief is denied; (2) the likelihood of harm to the opposing party if the requested relief is granted; (3) the movant's likelihood of succeeding on the merits of the action; and (4) the public interest. *See Equity in Athletics, Inc. v. Dep't of Educ.,* 504 F. Supp. 2d 88, 99 (W.D.Va. 2007) (citing *Direx Israel, Ltd.*, 952 F.2d at 812).

Based on the information currently before the court, I find that Carty has failed to establish that the entry of a preliminary injunction is appropriate. In particular, I find that Carty has failed to show that he would likely suffer irreparable harm if preliminary injunctive relief is denied. I further find that Carty has failed to show a likelihood of success on the merits.

Frankly, based on the evidence presented, I do not find Carty's versions of the facts credible. Carty claims he has been assaulted and harassed in retaliation for filing suit against Mathena and Scarberry. To the contrary, Mathena and Scarberry testified that they had not told anyone at the prison that Carty had sued

them. In fact, Mathena said that he did not know that he had been sued until only a couple of weeks before appearing in court on October 23. Likewise, Scarberry testified that she learned of the suit only about a month before the hearing. Both these dates were long after Carty claims that he was assaulted and harassed on June 8, June 15 and June 29 for filing the lawsuit.

The facts presented do not persuade me that Carty has been denied showers or recreation. The facts presented persuade me that the only dates on which Carty has been denied a meal, is when he would not comply with procedures to receive his meal trays. The facts presented persuade me that, if Carty has been subjected to the use of force, that use of force has been no more than necessary to control Carty's actions. The facts further persuade me that, if Carty was deprived of clothing or blankets on occasion, it was only during when he was placed in restraints to control his actions.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Carty has failed to establish that the entry of preliminary injunctive relief is appropriate; and
2. The court should deny the Motion.

# RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny the Motion.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 13th day of December, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE