# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **CHRIS CARTY,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:13cv00234 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **P. SCARBERRY, et al.,** | ) | By: Pamela Meade Sargent |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Chris Carty, is a Virginia Department of Corrections, ("VDOC"), inmate currently housed at Red Onion State Prison, ("ROSP"). This matter is before the undersigned on the plaintiff's motion for entry of preliminary injunctive relief preventing the defendants and their agents from taking any retaliatory action against the plaintiff for filing this lawsuit. (Docket Item No. 47) ("Motion"). The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

## *I. Facts*

Carty brings this civil rights action against P. Scarberry, ROSP Food Service Director, and R. C. Mathena, ROSP Warden. Carty claims that these defendants have refused to provide him with the proper medically prescribed diet. On July 17, 2013, Carty filed a motion for preliminary injunctive relief. (Docket Item No. 15). By Memorandum Opinion & Order entered October 9, 2013, the court refused Carty's motion insofar as it sought entry of a preliminary injunction ordering that the defendants provide him with a "vegetarian cardiac diet." That motion also

claimed that Carty was being subjected to cruel and unusual punishment through inhumane conditions of confinement and other actions taken by ROSP employees in retaliation for filing this action against the defendants. Carty appeared and testified at an October 23 evidentiary hearing on these additional claims for injunctive relief. By Report and Recommendation entered December 16, 2013, (Docket Item No. 46), the undersigned recommended that the court deny Carty's motion for entry of a preliminary injunction.

Subsequent to the filing of that Report and Recommendation, Carty filed an affidavit from himself and an affidavit from fellow ROSP inmate William Sally on December 20, 2013. (Docket Item No. 47). In these affidavits, which are sworn to under penalty of perjury, Carty and Sally claim that on December 10, 2013, all of Carty's property was removed from his cell, and Carty was badly beaten and seriously injured by ROSP correctional officers in retaliation for filing this lawsuit. The undersigned ordered that these affidavits be considered as an additional motion for injunctive relief and ordered the defendants to respond to the Motion.

In Carty's affidavit, he claims that Officers C. Rose and M. Wood, Lt. P. Payne, Sgt. J. Hall and Sgt. Ingle on December 10, 2013, beat him by stomping him with their feet and punching him with their fists. He claims this beating left him with a knot on his head, a fractured thumb, a busted nose, a busted lip, and bruises and cuts on his face, back, shoulders, wrists, legs, neck and stomach. Carty claims that these wounds are becoming infected because he is being denied medical care. He further claims that pepper spray was used on him and that all his property, including his legal documents, were taken. Carty claims that he was placed in Cell No. 302 with a toilet that has not worked since December 10, 2013.

Carty further claims that he has had no drinking water and that the cell has no shelves, no desk and no mattress. He claims that he has no toothbrush, socks, shoes or change of clothing. Carty claims all this has been done in retaliation for filing this lawsuit and for pursuing the earlier motion for injunctive relief against alleged retaliation.

In Sally's affidavit, he claims that on December 9, 2013, he was housed in ROSP Cell No. 307, next door to Carty in Cell No. 306, when he overheard Sgt. J. B. Hall tell Carty that he was going to send Carty to the hospital if Carty did not stop filing lawsuits. Sally also claims that on December 10, 2013, he saw Hall stop at Carty's cell and "threaten, provoke and harass" Carty. Sally claims that he heard Hall and Carty "bickering" back and forth and then, without any reason, Hall told Carty he was going to place him on strip cell status.

Sally claims that Rose, Wood, Payne and Ingle then arrived at Carty's cell with pepper spray, which Hall sprayed into Carty's cell for no reason. Sally claims that, after the pepper spray was used on Carty, he complied with Payne's order to back up to the tray slot to be restrained. Sally further claims that, after Carty's cell door was opened, Wood and Rose pulled Carty, who was kneeling on his knees, from his cell. Sally states that he witnessed the officers removing all of Carty's property from his cell. Sally claims that he saw Rose and Wood "dig their fingers in … Carty's collarbone … and pull both his arms back applying force for no reason…." Sally states that the officer kept telling Carty to stop resisting even though Carty was not resisting.

Sally claims that the officers then pushed Carty face down on the floor. He claims that Payne started grabbing and pulling Carty's head, while Hall grabbed the back of Carty neck, "applying more needless use of force." He claims that Rose and Wood were bending Carty's arms and fingers back for no reason other than to inflict pain. Sally also claims that the officers placed a spit mask on Carty for no reason.

Sally claims that the officers "carried" Carty back into Cell No. 306 and began beating him. In particular, Sally's affidavit states: "Then I heard the constant beating and assault upon … Carty with … Carty screaming for help." Sally claims this beating lasted approximately 15 minutes. Sally claims that the officers then brought Carty back out of Cell No. 306 with blood running down from his head area onto the floor and dragged him to Cell No. 302.

On January 13, 2014, Carty filed additional documents, (Docket Item No. 55), again claiming that he was "badly physically beaten by prison officials" on December 10, 2013, leaving him with a swollen fractured thumb, busted nose, busted lip, knot on his head and cuts and bruises all over his face, neck, shoulder, back, chest, arms, stomach, wrists, knees, legs and ankles. In a sworn affidavit dated December 30, 2013, (Docket Item No. 55, Att. No. 1), Carty states that, after he was pulled back into Cell No. C-306, Ingle, Hall, Payne Wood and Rose "then started to physically brutalize me by assaulting me, punching, slapping me in my face and body - kicking and [stomping] on and all over me -spitting on me - standing on me – and applying unnecessary force upon my arms and fingers…." In this affidavit, Carty states that the alleged assault lasted "about" 15 minutes. He claims that when he was again removed from Cell No. C-306, he was bleeding

from his face and mouth. Carty states he was then "dragged on the floor" to Cell No. C-302. Carty again complained that he had been placed in a cell with no working toilet, with feces in toilet and urine on the floor, with no drinking water, with no soap, no toothpaste, no toothbrush, no socks, no shoes and no change of clothing. Carty again complained that he was being denied medical treatment for injuries he suffered on December 10.

Included in these documents are a number of handwritten Informal Complaint forms, all signed by Carty and dated December 25, 2013, claiming that he is being denied medical treatment for injuries he alleged that he suffered on December 10. (Docket Item No. 55, Att. No. 2 at 6-9). On one of these forms, Carty complains that the prison physician, Dr. Smith, told him that he could not see anything wrong with his thumb, but that he would refer Carty for an x-ray. Also, Carty complains that Dr. Smith and several nurses told him that they could not see any cuts and bruises on his body.

Included in these documents is another affidavit from Sally signed under penalty of perjury. (Docket Item No. 55, Att. No. 2 at 1-3). This affidavit repeats the allegations in Sally's other affidavit, including claims that officers used OC spray on Carty for no reason, that officers brutally beat Carty while he screamed for help for about 15 minutes and that Carty had blood coming from his face when he was taken to Cell No. C-302.

On January 16, 2014, Carty filed another affidavit made under penalty of perjury. (Docket Item No. 57). In this affidavit, Carty states that ROSP Investigator Bentley allowed Carty to watch video recordings taken of the December 10

incident. Carty states that the recording does not contain any threat by him to throw feces on prison staff. Carty also states that the recording does not show him trying to assault or bite the officers or being disruptive. Carty again claims that his thumb was broken, his lip busted and his body bruised and cut in the incident.

Carty also has filed a declaration made under penalty of perjury by Tyran Gardin. (Docket Item No. 55, Att. No. 2 at 4). Oddly, Gardin's declaration is almost a verbatim copy of Sally's affidavits. In this declaration, Gardin states that, while standing at his cell door, Cell No. C-321, on December 9, 2013, he heard Hall tell Carty, who was in Cell No. C-306, that he would send him to the hospital if he kept filing lawsuits. Gardin states that, on December 10, he observed Hall use OC spray on Carty for no reason. Gardin states that Carty then complied with orders to be restrained to be removed from the cell.

Gardin states that, after Carty was removed from the cell, he saw Wood and Rose push Carty face down onto the floor and Payne and Hall pulling Carty's head backward. Gardin, too, claims that, after the officers returned Carty to Cell No. C-306, he heard the officers assaulting Carty and Carty screaming for help for about 15 minutes. Gardin also states that when Carty was moved from Cell No. C-306 to Cell No. C-302, the officer dragged him across the floor with blood running from his face.

Carty also has submitted a declaration made under penalty of perjury by Corey Smith, (Docket Item No. 55, Att. No. 2 at 23). Oddly, Smith's declaration also is almost a verbatim copy of Sally's and Gardin's, including some of the same misspellings. Smith states that while standing at the door of his cell, No. C-308, at

ROSP on December 9, 2013, he heard Hall tell Carty that if Carty did not stop filing lawsuits, Hall was going to send Carty to the hospital. Smith states that Hall used OC spray on Carty for no reason. Smith also states that Payne and Hall pulled Carty's head backward while Rose and Wood were holding him face down on the floor. Smith also claims that, after the officers took Carty back into Cell No. C-306, he heard them assaulting Carty and Carty shouting for help for about 15 minutes. He also claims that, when Carty was moved from Cell No. C-306 to Cell No. C-302, he saw blood dripping from Carty's face.

In response to the Motion, the defendants have filed affidavits from Hall and V. Phipps, the Head Nurse at ROSP. (Docket Item No. 54, Att. Nos. 1-3). The defendants also have provided the court with a DVD containing video recordings made on December 10 and 11, 2013, as Carty was being removed from his cell and after Carty was placed in five-point restraints.

Hall, in his affidavit, states that, at 7:30 a.m. on December 10, 2013, while doing rounds at ROSP, he noticed the strong odor of feces coming from Cell No. C-306, which housed Carty. He states that he ordered Carty to be restrained to be brought out of his cell so that officers could search his cell. Hall states that Carty refused to submit to be restrained and threatened to throw feces on staff. Hall states that he then notified Payne and ordered Officer Deel to retrieve a video camera and begin recording the incident.

Hall states that, after Carty refused multiple orders to present himself to be restrained, he determined that he would use pepper spray to compel Carty to comply with the order to present to be restrained. Hall states that he consulted the

medical department and was advised that there was no medical reason that would prohibit the use of pepper spray on Carty. Hall states that he then administered a one-half second to one second burst of pepper spray towards Carty's facial area. Hall states that Payne then ordered Carty to present to be restrained, and Carty, again, refused the order. Ingle then administered an additional one-half second to one second burst of pepper spray to Carty's facial area, according to Hall, and Carty then complied with the order to be restrained.

According to Hall, Wood and Rose restrained Carty and removed him from his cell to outside of his cell door. Hall states that he offered Carty water decontamination from the pepper spray in the shower, but Carty refused. Hall states that Carty became disruptive after being removed from his cell, so he ordered that a spit mask be placed over Carty's head. Hall states that he also ordered Carty to be lowered to his knees because he became verbally disruptive and attempted to pull away from the officers. When Carty continued to resist, Hall states that he ordered the officers to lower him onto the pod floor on his stomach and for staff to utilize wrist lock techniques to control Carty's disruptive behavior.

Hall states that, while Carty was outside of his cell, Payne decontaminated his cell. Hall states that he recommended that Carty be placed back in his cell in ambulatory restraints to manage his disruptive behavior. When the officers attempted to place Carty in ambulatory restraints after returning him to Cell No. 306, he became disruptive and attempted to bite Wood and Rose, Hall states, and Unit Manager Swiney authorized placing Carty in five-point restraints due to his disruptive behavior and to protect staff. Hall states that Carty was then moved to Cell No. C-302 and placed in five-point restraints without incident at 8:10 a.m.

According to Hall, five-point restraints is a method of restraining an offender where the offender is placed face up on the bed with both arms and legs restrained to the bed. A strap is also placed across the offender's chest and restrained to the bed. Hall states that, after Carty was placed in five-point restraints, he was assessed by Nurse Scott. Hall states that Carty complained to Scott of a busted mouth and multiple broken fingers. Scott was unable to assess Carty's mouth because of the spit mask on his face, Hall states. Scott did assess Carty's fingers and found no evidence of broken bones, according to Hall.

According to Hall, Carty was offered breaks from the five-point restraints at 10:40 a.m., 11:15 a.m., 1:30 p.m., 2:05 p.m., 3:30 p.m., 4 p.m. and 5 p.m. on December 10 and at 12:19 a.m. and 3:05 a.m. on December 11. Hall states that Carty would be able to use the toilet, wash his hands and drink water during each of these breaks. Hall states that Carty was released from five-point restraints without incident at 6:45 a.m. on December 11, 2013. Hall states that Nurse Mullins assessed Carty upon his release from five-point restraints. According to Hall, Nurse Mullins noted that Carty complained of a dislocated right thumb, a bruise on his neck and an open lip. Nurse Mullins noted no swelling or discoloration other than a skin abrasion on Carty's collarbone.

Hall concedes that, when Carty was placed in five-point restraints, his personal property was removed from his cell. According to Hall, the property was inventoried and placed in a secured area until Carty was released from five-point restraints. Hall states that Carty refused his personal property when he was released from five-point restraints. Hall states that he and other staff members offered Carty his personal property on December 12, 13, 17-21 and 23. On each occasion, Hall

states, Carty has refused his property. On December 24, 2013, Carty accepted his personal property from Hall.

Hall also specifically denied that he ever threatened to send Carty to the hospital if he did not stop filing lawsuits. Hall states that he does not retaliate or harass Carty because of any of his pending lawsuits.

A number of exhibits were filed with Hall's affidavit. (Docket Item No. 54, Att. Nos. 1-2). These exhibits include an Incident Report generated by A. J. Gallihar and dated December 12, 2013. (Docket Item No. 54, Att. No. 1 at 7-9). This Incident Report supports Hall's version of the events of December 10, 2013. The exhibits also include a Restroom and Meal Break Releases Five Point Humane Restraints form for Carty, noting that he was placed in five-point restraints at 8:10 a.m. on December 10 and released from restraints at 6:45 a.m. on December 11. (Docket Item No. 54, Att. No. 1 at 12). The form notes that Carty was given rest breaks from restraints at 10:45 a.m., 1:30 p.m., 2:05 p.m., 3:30 p.m., 5 p.m. and 8:30 p.m. on December 10 and 3:05 a.m. on December 11. The form also notes that Carty was given meal breaks at 11:15 a.m. and 4 p.m. on December 10.

The exhibits also include an Inmate Accident/Injury Report Form completed by Nurse Scott on December 10, 2013. (Docket Item No. 54, Att. No. 1 at 10). This form notes that Scott assessed Carty after he was placed in five-point restraints in Cell No. C-302 at 8:10 a.m. on December 10, 2013. Scott noted that Carty complained of a busted mouth and multiple broken fingers. Scott noted that he was unable to assess Carty's mouth because he was wearing a spit mask. According to Scott, he did assess Carty's fingers and found no evidence of any broken bones.

The exhibits attached to Hall's affidavit also include an Inmate Accident/Injury Report Form completed by Nurse Mullins when Carty was released from five-point restraints at 6:45 a.m. on December 11, 2013. (Docket Item No. 54, Att. No. 1 at 11). On this form, Mullins noted that Carty complained of an injury to his right thumb, a bruise on his neck and a cut on his lip. Mullins noted that, based on her assessment, there was no evidence of swelling or discoloration seen, including no bruise on Carty's neck. She did note a skin abrasion on his collarbone.

Also included among the exhibits is a Personal Property Inventory form showing the property taken from Carty's cell on December 10, 2013. (Docket Item No. 54, Att. No. 2 at 1). While the items of property listed on this form are difficult to read, it appears that Carty signed the form on December 24, 2013, indicating that all his property taken on December 10 had been returned to him. Also included among the exhibits are Internal Incident Reports noting that Carty's property was offered to him, and he refused to take it back on December 11, 12, 13, 17, 18, 19, 20, 21 and 23. (Docket Item No. 54, Att. No. 2 at 2-10). These reports were completed by at least three different individuals. There also is an Internal Incident Report dated December 24, 2013, completed by Hall, which states that Carty's property was offered to him again on this date, and he accepted it. (Docket Item No. 54, Att. No. 2 at 11).

The exhibits also include three Disciplinary Offense Reports dated December 10, 2013, which show that Carty was charged with the disciplinary infractions of threatening bodily harm, disobeying an order and attempting to commit/simple assault upon a non-offender as a result of the December 10, 2013,

incident. (Docket Item No. 54, Att. No. 2 at 12-15). Two of these reports were completed by Hall, and his descriptions of events on these reports are consistent with Hall's version of events in his affidavit and the version of events contained in the Incident Report. On one of these Disciplinary Offense Reports, Officer Wood gives the following description of the offense:

> …I Officer M. Wood was called by Sgt. Hall to assist him in C-3 pod. When I arrived at C-306 Sgt. Hall gave Offender C. Carty … several orders to be restrained in which he refused to comply with orders. Sgt. Hall called for OC approval and was given approval by nurse. At that time offender Carty was [given] a direct order to back up to be restrained in which he refused. Sgt. Hall administered a one half to one second burst of [OC] to attempt to get offender to comply with orders. Offender Carty still refused all orders to be restrained. At that time a second burst of one half to one second bust of [OC] was … administered and offender Carty complied with orders at that time. Offender was restrained and removed from his cell for decontamination … which he refused to be decontaminated. Offender Carty attempted to pull away from staff and offender was ordered by Sgt. Hall to kneel down on his knees. Once offender kneeled down offender still continued to be disruptive and wrist locks [were] utilized by myself and Officer Rose. Sgt. Hall gave orders to lower offender to pod floor to maintain control of him. Offender made several attempts to stand up and wrist locks continued to be utilized to maintain control of offender. After Offender Carty's cell was decontaminated offender was placed back in his cell. As Sgt. Hall attempted to place offender in ambulatory restraints offender attempted to bite Officer Rose. Offender was lowered to cell floor to maintain control of offender[']s disruptive behavior. Offender still continued to resist staff and wrist locks were utilized again to control inmate[']s behavior. At that time myself and Officer Rose assisted Lt. Payne, Sgt. Hall, and Sgt. Ingle in escorting offender Carty to C-302 where Offender was placed into five point restraints. Nurse Scott [c]hecked offender [C]arty[;] no injuries to myself.

On January 24, 2014, Carty filed another affidavit made under penalty of perjury. (Docket Item No. 61). In this affidavit, Carty denies that he ever refused the return of his personal property, as no one ever came to his cell door to offer such return. Carty further states that Hall and Wood falsified the Disciplinary Offense Reports and that the video evidence shows that such charges against him were "bogus."

The video recordings made on December 10 and 11, 2013, as Carty was being removed from his cell and after Carty was placed in five-point restraints, in large part, support the correctional officers' versions of events and contradict the version of events offered by Carty and the other inmates. In particular, the video recording shows that Hall and Payne gave Carty numerous orders to present himself to be restrained to be removed from his cell. While much of what Carty says in response to these orders is unintelligible on the recording, at one point, Carty clearly says "f-ck you" in response to the order to be restrained. The video recording shows two short bursts of OC spray being administered. Carty continues to face the door for several minutes before Carty turns and submits to be restrained and is removed from the cell. The video recording shows Payne asking Carty if he wants "water decontamination," to which Carty states "I am good."

The video recording shows that, after Carty is removed from his cell, a spit mask is put on his head. It also shows that, while Payne was decontaminating Carty's cell, the officers controlling Carty lower him face down on the floor. After placing Carty on the floor, the officers simply held him there.

After the cell is cleaned, the officers bring Carty to his feet and walk him into Cell No. C-306 where Carty is again placed in a kneeling position. As Hall attempts to place ambulatory restraints on Carty, the video shows Carty turning his head toward one of the officers, and the officers place him face down on the floor. Hall instructs the officers to use the wrist lock maneuver on Carty to control him. In an effort to do that, Hall gives Carty several orders to open his hands.

While being restrained in the cell, Carty yells only twice at approximately 25 minutes and 47 seconds into the recording. Carty yells, "Leave me alone." He then yells, "You are going to break my f-cking hand." During the almost 12 minutes that Carty and the officers are in Cell No. C-306, it is relatively quiet. There is no sound that could be mistaken for the sound of an assault or even a struggle. In particular, the video shows that Carty does not yell out or scream for help.

Later, Carty is lifted to his knees, then stood to his feet and walked to Cell No. C-302, where he is placed on a bed in five-point restraints. There are no signs of injury or blood anywhere on Carty, other than a small quarter-sized spot on the front of the spit mask that could be blood.

Despite the statements of Carty, Sally, Gardin and Smith to the contrary, the video recordings show that the officers did not punch, kick, slap, stomp or step on Carty at any time. The video recordings show that Carty did not scream or shout for help at any time. The video recordings show that the officers did not drag Carty to Cell No. C-302. The video recordings also do not show any visible signs of injury or bleeding on Carty, other than the one spot on the spit mask. Nor do the videos show Carty in any visible physical distress.

The videos also document Nurse Scott assessing Carty after he is placed in five-point restraints and each officer giving an explanation of his role in the incident. The video recordings also show Hall taking photographs of Carty at 8:35 a.m. At that time, Carty is in five-point restraints wearing only boxer shorts. There are no visible signs of injury or blood on Carty's face, head or body. The video recordings later document each time Carty is offered a break from restraints. The recordings show that Carty, on occasion, did get up and use the bathroom, flush the toilet and get a drink of water.

In particular, the video recordings also show a nurse assessing Carty after he is returned to five-point restraints after his evening meal at 4:26 p.m. on December 10. Carty complains of injury to his thumb and lip, and the nurse states that she sees no injuries.

The defendants also have provided an affidavit from V. Phipps, Head Nurse at ROSP. (Docket Item No. 54, Att. No. 3). Phipps stated that she reviewed Carty's medical records regarding any medical treatment he received since December 10, 2013. According to Phipps, Carty's medical records show that at 7:30 a.m. on December 10, Nurse Adams noted that security was requesting OC and electronics approval, and she found no contraindications in his medical records, so approval was given. At 8:10 a.m, Nurse Scott noted that he assessed Carty after being placed in five-point restraints. Scott noted that Carty complained of a busted mouth and broken fingers. Scott stated that he could not assess Carty's mouth and lower face due to a spit mask being in place. Scott noted no bruising, swelling or redness on any of Carty's fingers and no crepitus upon palpation. He also noted that Carty was able to move his fingers. At 4:25 p.m., Carty complained to Nurse Yates that his

mouth was busted. Yates noted there was no bleeding. At 8:20 p.m., Carty voiced no complaints to Nurse Stanley. When Carty was released from five-point restraints at 6:45 a.m. on December 11, he complained to Nurse Mullins of a dislocated right thumb and a bruise on his neck. Mullins noted no bruising or dislocation to his right thumb. She did note an abrasion on his right collarbone.

Phipps also stated that Carty again complained of right thumb pain on December 17 and December 23, 2013. An x-ray of Carty's right hand and thumb was taken on January 9, 2014, and no fractures or abnormalities were found. Phipps stated that, based on her review of Carty's medical records, Carty had not been denied medical care since the December 10 incident.

## II. Analysis

"The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989)). The party seeking entry bears the burden to establish that these factors support granting a preliminary injunction: (1) the likelihood of irreparable harm to the movant if preliminary injunctive relief is denied; (2) the likelihood of harm to the opposing party if the requested relief is granted; (3) the movant's likelihood of succeeding on the merits of the action; and

mouth was busted. Yates noted there was no bleeding. At 8:20 p.m., Carty voiced no complaints to Nurse Stanley. When Carty was released from five-point restraints at 6:45 a.m. on December 11, he complained to Nurse Mullins of a dislocated right thumb and a bruise on his neck. Mullins noted no bruising or dislocation to his right thumb. She did note an abrasion on his right collarbone.

Phipps also stated that Carty again complained of right thumb pain on December 17 and December 23, 2013. An x-ray of Carty's right hand and thumb was taken on January 9, 2014, and no fractures or abnormalities were found. Phipps stated that, based on her review of Carty's medical records, Carty had not been denied medical care since the December 10 incident.

## II. Analysis

"The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989)). The party seeking entry bears the burden to establish that these factors support granting a preliminary injunction: (1) the likelihood of irreparable harm to the movant if preliminary injunctive relief is denied; (2) the likelihood of harm to the opposing party if the requested relief is granted; (3) the movant's likelihood of succeeding on the merits of the action; and

(4) the public interest. *See Equity in Athletics, Inc. v. Dep't of Educ.,* 504 F. Supp. 2d 88, 99 (W.D.Va. 2007) (citing *Direx Israel, Ltd.*, 952 F.2d at 812).

Based on the evidence currently before the court, I find that Carty has failed to establish that the entry of a preliminary injunction is appropriate. In particular, I find that Carty has failed to show that he would likely suffer irreparable harm if preliminary injunctive relief is denied. I further find that Carty has failed to show a likelihood of success on the merits.

Carty is correct when he argues that the video evidence provided by the defendants does not establish whether, on December 9, 2013, Hall threatened to injure Carty if he continued to file lawsuits as Carty, Sally, Gardin and Smith claim Hall did. Nor does the video show whether Hall told Carty on the morning of December 10, 2013, that he was placing Carty on strip cell status for no reason as they claim. The video evidence does, however, prove that many of the representations made by Carty, Sally, Gardin and Smith in their "sworn" or "made under penalty of perjury" statements are false. So much so, in fact, that it draws into question the credibility of any of the statements made by Carty, Sally, Gardin and Smith. The Fourth Circuit has held that where, as here, "the record contains an unchallenged videotape capturing the events in question, [the court] must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")).

In particular, the video recording shows, contrary to the representations of Carty, Sally, Gardin and Smith, that the officers did not assault, punch, slap, kick, stomp, spit on or stand on Carty at any time from the time he was first removed from Cell No. C-306 until he was placed in five-point restraints in Cell No. C-302, approximately 20 minutes later. The video recording shows that Carty did not scream or yell for help at any point during this incident. The video recording shows that Payne and Hall did not pull Carty's head backwards while he was being held on the floor. The video recording shows that the officers did not "drag" or "carry" Carty from Cell No. C-306 to Cell No. C-302, but rather that Carty walked between the cells. The video recording shows that there was no blood running from or dripping off Carty's face or head as he walked between cells. In fact, the video shows that his face was covered with a spit mask at this time. The video recording does show that, at most, Carty might have suffered a busted lip in the incident, but it also shows that he did not suffer from cuts and bruises all over his face, neck, shoulder, back, chest, arms, stomach, wrists, knees, legs and ankles. The video also shows that Cell No. C-302 had an operating, flushable toilet and drinking water available when Carty was placed in the cell.

Frankly, based on the video evidence presented, I find that Carty was not assaulted by officers as he was removed from his cell on December 10, 2013. The video recording shows that Carty was giving numerous orders to present himself to be restrained to be removed from his cell before OC spray was used. Even after the OC spray was used, the video recording shows that Carty continued to refuse to be restrained. After being removed from the cell, the only uses of force against Carty came as he was taken to the floor on two occasions. On the first occasion, the video recording shows that Carty refused to comply with the officers' orders to

keep his head still and facing to the front. On the second occasion, the video recording shows that Carty suddenly turned his head toward one of the officers while being placed in ambulatory restraints. While the video recording neither proves nor disproves Hall's assertion that Carty was attempting to bite the officer, Carty's sudden movement while being restrained would justify the use of force to control him. Nonetheless, I find that the video evidence is sufficient to overcome Carty's claim that the charges contained in the Disciplinary Offense Reports were bogus.

Lastly, with regard to Carty's claim that he never refused the return of his property because no one came to his cell door to offer such return, I find that injunctive relief is inappropriate because Carty now has received the property at issue.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Carty has failed to establish that the entry of preliminary injunctive relief is appropriate; and
2. The court should deny the Motion.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny the Motion.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: January 30, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE